## In re INTERBOROUGH CONSOL. CORPORATION.*

(Circuit Court of Appeals, Second Circuit. January 16, 1923.)

Nos. 9, 10.

1. **Bankruptcy ⊜440—Appeal and petition to revise not cumulative, but inappropriate remedy will be dismissed.**

   The remedies of appeal and petition to revise are mutually exclusive, and not cumulative, and, where both are taken, the improper remedy will be dismissed, and the case determined on the other.

2. **Bankruptcy ⊜440—Creditors' proceeding to obtain payment of coupons from bank deposit "controversy arising in bankruptcy," reviewable by appeal.**

   A proceeding by creditors to obtain payment of interest coupons out of funds deposited by a bankrupt with a trust company is a "controversy arising in bankruptcy," and the proper remedy is by appeal, under Bankruptcy Act, § 24a (Comp. St. § 9608), and not by petition to revise, under section 24b.

   [Ed. Note.—For other definitions, see Words and Phrases, Second Series, Controversy Arising in Bankruptcy Proceedings.]

3. **Corporations ⬳155(2)—Special fund set aside for declared dividend, constitutes trust fund for stockholders, which other creditors cannot claim.**

Where a corporation specifically appropriates and sets apart from its other assets a fund for the payment of a declared dividend, such fund is held in trust by the corporation for payment of the stockholders to the exclusion of other creditors, and where such fund is established by bank deposit, such deposit cannot be withdrawn or reclaimed, either by the corporation or its receiver.

4. **Bankruptcy ⬳140(3)—Coupon trust fund in special bank deposit held not trust fund for coupon holders.**

Where bonds and interest coupons issued by a corporation contained nothing more than its promise to pay at its office or agency, and payment was made by corporate checks drawn on the trust company, in which it had a special account, specially designated as a fund to meet interest on such bonds, but nothing further was done to declare such account a trust fund for that purpose, by the corporation or its successor, on the bankruptcy of the latter, the coupon holders could not claim it as a trust fund for payment of their coupons.

5. **Banks and banking ⬳119—General deposit creates relation of debtor and creditor.**

On a general deposit, title to money deposited passes to the bank, and creates the relation of debtor and creditor between bank and depositor.

6. **Banks and banking ⬳134(4)—Special deposit, subject to depositor's check, is subject to set-off, and is not trust fund.**

Where a fund is deposited for a specific purpose, but subject to depositor's check, it remains the property of the depositor, is subject to set-off, and is in no sense a trust fund.

7. **Banks and banking ⬳90—Deposit of special fund to meet bonds payable at certain time makes bank agent of obligor.**

Where bonds are made payable at a particular bank and at a particular time, and funds are left with the bank, to be applied in payment of the bonds, the bank holds such funds as agent of the obligor, and not as agent of the obligee.

8. **Payment ⬳38(1)—Creditor trustee to apply payment as directed by debtor.**

One who sends money to another, with directions to apply it on a debt due the latter, receives the money in trust to apply it as directed.

9. **Trusts ⬳33—Acceptance of deposit, with direction to pay it to particular person, creates trust enforceable in equity.**

Where one deposits money with another to be delivered to a designated person, a trust arises in favor of the latter by reason of acceptance of the fund by the depository with notice of its destination, and a court of equity will compel the depositor to devote it to the purpose intended.

10. **Trusts ⬳359(1)—Trust created by receipt of money for payment to another, or for application to particular purpose, may be enforced at law or in equity.**

Every person who receives money to be paid to another, or to be applied to a particular purpose, to which he does not apply it, may be sued either at law for money had and received, or in equity as a trustee for breach of trust.

11. **Liens ⬳7—Equitable lien not created, without "charge" against fund.**

An equitable lien is not charged against a fund, unless such fund is bound for the performance of an obligation imposed; a "charge" being defined as a lien, incumbrance, or claim, which is to be satisfied out of the specific thing or proceeds to which it applies.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Charge.]

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**12. Liens ⊜⇒7—Deposit intended to pay creditor creates no lien against fund without agreement with creditor.**

A deposit of money in bank, the depositor intending to use it to pay a particular obligation, but without any agreement to that effect with the creditor, creates no equitable lien on the deposit in favor of such creditor.

**13. Liens ⊜⇒7—Trusts ⊜⇒35(1)—Promise to pay from particular fund creates lien, when fund comes into existence, and makes fund holder trustee.**

A promise based on a consideration to pay out of a particular fund creates a lien on the fund, which attaches to the fund when it comes into existence, and which equity will enforce, holding the promisor to be a trustee as soon as he gets title.

**14. Liens ⊜⇒7—Contract to make fund security for debt creates equitable lien.**

A contract whereby a party sufficiently indicates his intention to make some particular property or fund described a security for debt or other obligation creates an equitable lien thereon.

**15. Liens ⊜⇒15—Enforceable in equity against volunteers or persons with notice.**

Where the owner or possessor of property by agreement creates a charge or claim in the nature of a lien against it, equity will establish and enforce such lien, not only against him who stipulated to give it, but against third persons, who are either volunteers or take with notice.

**16. Bankruptcy ⊜⇒140(3)—Liens ⊜⇒7—Special deposit to pay interest, not creating trust or lien, enforceable by coupon holders in bankruptcy.**

Where payment of corporate bonds and interest coupons was to be made at the office or agency of the corporation, its special deposit with a trust company in a special account designated to pay such coupons, with no agreement, however, to that effect with bondholders, payments of interest being made by the corporation's check on such deposit, there was no trust nor equitable lien created on behalf of coupon holders, and on bankruptcy of the corporation's successor the trustee was entitled to the deposit, free from such claims of trust or lien.

**17. Assignments ⊜⇒48—Liens ⊜⇒7—Difference between equitable liens and assignments stated.**

An equitable lien is unlike an equitable assignment, in that the lien, though not a title, is available by way of charge, while an equitable assignment gives the assignee a title that, though not recognizable at law, will be recognizable by equity.

**18. Assignments ⊜⇒48—No equitable assignment, where no agreement to that effect.**

A deposit by a corporation to pay interest coupons *held* not subject to any equitable assignment in favor of the coupon holders, there having been no agreement with them for the establishment or use of the deposit.

**19. Equity ⊜⇒57—Facts held not to warrant equity in granting special relief to creditors, under rule that equity considers that as done which ought to be done.**

In proceedings by coupon holders to subject bankrupt's special deposit to payment of their coupons, the deposit having been created by the bankrupt for payment of such obligations, but without agreement to that effect with coupon holders, *held*, that facts did not justify relief to creditors, the presentation of whose claims was delayed by the war, on the ground of hardship, under the rule that equity will consider that as done which could have been done, had it not been for accident.

Petitions to Revise and Appeals from the District Court of the United States for the Southern District of New York.

In the matter of the Interborough Consolidated Corporation, bankrupt. Petition by Gustave Porges, on behalf of himself and all others

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

similarly situated, for the application of certain funds of the bankrupt, in which proceeding De Rothschild Frères and another intervened, praying like relief. From an order denying the petitions (277 Fed. 249), the petitioners appeal and bring petitions to revise, which were consolidated and submitted on one printed record. Order affirmed.

This cause comes here upon petitions to revise and appeals from an order entered on January 21, 1922, in the United States District Court for the Southern District of New York, which appeals and petitions to revise were consolidated and directed to be submitted to this court upon one printed record. The appellants seek a decree that a certain fund, amounting to $431,910, on deposit with the Empire Trust Company, for the payment of interest on certain bonds issued by the Interborough Metropolitan Company, entered upon the books of the trust company under an account entitled "James R. Sheffield, trustee, Interborough-Consolidated Corporation, Interest on Interborough-Metropolitan Company 4½% Bonds," be applied to the payment of the coupons attached to the said bonds, which became due prior to said adjudication, and that it should not be merged with the general funds of the bankrupt for distribution among the general creditors.

A petition in bankruptcy was filed in the District Court for the Southern District of New York against the Interborough Consolidated Corporation, and thereafter, and on April 25, 1919, James R. Sheffield was duly appointed trustee of the bankrupt, having previously, and on March 21, 1919, been appointed as receiver. At the time of the bankruptcy of the Interborough Consolidated Corporation hereinafter referred to as the Consolidated, it had on deposit with the Empire Trust Company, hereinafter referred to as the Empire Trust, a fund amounting to the sum of $431,910, said fund being in the account entitled "Interborough Consolidated Corporation, Interest on Interborough Metropolitan Corporation 4½% Bonds." The Interborough Metropolitan Corporation will hereinafter be referred to as the Metropolitan. The above fund the receiver left on deposit with the Empire Trust, but procured the title of the account to be changed on the books of the latter by prefixing to it his name as receiver; and later, upon his appointment as trustee, Sheffield procured the title of the account to be further changed on the books of the Empire Trust by substituting his title of trustee for his title of receiver.

On July 14, 1919, the trustee in bankruptcy petitioned the District Court for instructions as to whether he should disburse said fund in payment of coupons representing the interest due on said bonds, payable prior to and on October 1, 1918. Upon consideration of his petition the court ordered that the trustee be instructed and directed, until the further order of the court, not to disburse said fund, or permit it to be disbursed, to any holders of coupons of said bonds, or of claims for interest with respect to said bonds, but, until otherwise instructed and directed, to hold said fund as part of the general estate of the bankrupt, and further declared that such order was made without prejudice to the rights of holders of coupons of said bonds, or of claims for interest with respect to said bonds, to bring such actions or institute such proceedings to enforce the payment of such coupons, or claims, as they might be advised, and without prejudice to any order, judgment, or decree that might be applied for or rendered in such actions or proceedings.

It appears that Gustave Porges, on behalf of himself and all other holders of the 4½% collateral trust bonds of the Metropolitan, who had not received payment of interest upon such bonds which became due October 1, 1918, served a petition on March 2, 1921, on behalf of himself and all other persons similarly situated, upon the trustee of the bankrupt, as well as upon the Empire Trust, which prayed that the fund deposited as above described with the Empire Trust be held applicable to the payment of the interest which became due on the said bonds on October 1, 1918, and that the said fund be distributed among the holders of coupons representing such interest. Porges' petition shows that he owns certain of the bonds, and that from May, 1917, until March 21, 1919, the date of the

288 F.—22

appointment of Receiver Sheffield, Porges was in the military service of the United States and absent from this country and was unable to present his coupons for payment between these dates. Thereafter, on or about August 1, 1919, Porges presented the coupons for payment at the office of the Consolidated and payment was refused.

By an order dated April 8, 1921, De Rothschild Frères were allowed to intervene and to be joined as petitioners in the Porges application. The De Rothschild petition asked for the same relief. The petition of De Rothschild Frères shows that they are residents of Paris, France, and hold a large number of the bonds of $1,000 each, and that the semiannual interest coupons thereof are due and unpaid for the years 1915, 1916, 1917, and 1918. The De Rothschild bonds had been deposited by them for safekeeping in a safe deposit vault in a bank in Brussels, Belgium, in 1911. They were still in that bank in August, 1914, at the time of the invasion and occupation of Belgium by the German armies. The formal occupation of Belgium by those armies did not cease until November, 1918, and it was not until June, 1919, that access to the bonds was regained.

The trustee and the Empire Trust filed in the District Court separate answers to the petition aforesaid. The answer of the trustee admitted the deposit with the Empire Trust, but denied that it was a "special" one, or that a "special" account had been maintained exclusively for the purpose of paying interest on the Metropolitan bonds, or that the account had never been mingled with the general funds of the Metropolitan or of the Consolidated. It set forth that the deposit was an ordinary account made with a banking institution, and that the sum on deposit with the Empire Trust was composed of items deposited by the Consolidated from time to time, in order that in aid of its internal management and fiscal operations there might be a single account out of which payments of like character, to wit, interest on the aforesaid bonds, could be made by it, and that it was at all times reserved to and within the lawful powers of the directors of the Consolidated to apply such funds to any of the corporate purposes.

The answer of the Empire Trust was to the same effect and that the funds had been deposited from time to time as deposits subject to the check of the depositor, and that the duty of the Empire Trust with respect to the said funds was the duty which a bank owes to its depositor to pay out and disburse the same upon the check or order of the depositor in the ordinary course of business.

The bonds, the interest upon which it is claimed that the fund involved was deposited to pay, were issued on March 5, 1906, by the Interborough-Metropolitan Company, a rapid transit company in the city of New York, already referred to as the Metropolitan. The bonds were secured by a trust agreement executed by the company to the Windsor Trust Company as trustee. The bonds were coupon bonds of a series, and were for $1,000 each, and were numbered consecutively from one to 70,000. They were payable April 1, 1956. Interest was payable at the rate of 4½ per centum per annum at the Metropolitan's office or agency in the city of New York in gold coin on the 1st days of April and October in each year.

On June 1, 1915, the Metropolitan and the Finance & Holding Corporation consolidated, pursuant to the Business Corporations Law of New York, under the name of the Interborough Consolidated Corporation, hereinbefore referred to as the Consolidated and the bankrupt herein; and under section 11 of the New York Business Corporations Law, under which the consolidation was effective, it was expressly provided that upon consolidation the "new corporation shall succeed to and be held liable to pay and discharge all such debts and liabilities of each of the corporations consolidated in the same manner as if such new corporation had itself incurred the obligation or liability to pay such debt or damages. * * *"

At the time the Metropolitan issued the bonds and executed and delivered to the Windsor Trust Company the trust agreement above mentioned to secure the payment of the principal and interest, it inserted in the sixth article thereof a provision that the company (the Metropolitan) would maintain an office or an agency in the borough of Manhattan, in the city of New

York, where bonds and coupons might be presented for payment, and where notices and demands in respect to said bonds and coupons might be served; and on September 20, 1906, the company, through its executive committee, designated the Windsor Trust Company as its agent for the payment of the interest on the bonds. On March 15, 1911, ·the company, through its executive committee, passed another resolution directing that, instead of interest being payable through the Windsor Trust Company, it should be payable after April 1, 1911, at its own offices in the city of New York; and it became the custom of the treasurer of the company, shortly before any installment of interest on the bonds became due, to withdraw from the general funds of the company sufficient funds to pay the installment of interest becoming due and deposit them with the Windsor Trust Company, and, beginning with the year 1913, with the Empire Trust, which·had succeeded the Windsor Trust Company, and which entered on its books moneys so deposited in an account entitled "Interborough Metropolitan Company, Interest on Interborough Metropolitan Company 4½% Bonds." Upon the presentation of the coupons at the office of the Metropolitan, checks were drawn upon the Empire Trust for the several amounts of coupons so presented, and were delivered to the persons presenting the coupons. The checks stated on their face that they were to be paid out of the said fund for the payment of interest entitled as aforesaid. Interest payments to holders of registered bonds were made·by similar checks drawn to their order and sent to them by mail.

Upon consolidation of the Metropolitan and F. & H. Company; effective June 1, 1915, by direction of the treasurer of the Consolidated, the Empire Trust changed the title of the said interest account on its books so as to read Interborough Consolidated Corporation, Interest on Interborough Metropolitan Company 4½% Bonds." The funds then held by the Empire, and those afterwards deposited, were applicable and were applied to the payment of such interest. Such deposits were made semiannually to pay the April and October interest installments on the Collateral Trust bonds, the last of such deposits being made on September 30 and October 1, 1918, to pay interest. becoming due October 1, 1918. Upon presentation of the coupons at the office of the Consolidated, checks were drawn upon the Empire Trust, and were signed by the deputy treasurer and coupon clerk for the ·several amounts of coupons so presented, and were delivered to the persons presenting the coupons. The checks stated on their face that they were to be paid out of the fund for the payment of interest entitled as aforesaid. Checks for interest. payments were likewise sent to the registered holders of registered bonds, signed by the said deputy treasurer and the coupon clerk, drawn upon the Empire Company and payable out of the same fund. Such coupon holders as presented their interest ·coupons for payment up to the date of the receiver's appointment received payment of interest out of said funds. Interest payable on registered bonds October 1, 1918, was paid.

The court below denied the application of the petitioners, and directed the trustee to deal with the funds in question as general assets of the estate. The court held that the facts demonstrated that the Empire Trust's relations with the Consolidated were merely those of bank and depositor, and that the Empire Trust did not undertake to do anything beyond honoring the checks drawn by the Consolidated on the account.

George Zabriskie, George Gray Zabriskie, S. M. Stroock, Charles Levy, and I. B. Levine, all of New York City, for De Rothschild Frères and others.

Alfred A. Cook and Harold Nathan, both of New York City, for Sheffield.

Barber & Gibboney, of New York City, for Empire Trust Co.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). [1, 2] As this case is brought here both upon petition to revise and upon appeal, we again repeat what we said in Re B. & R. Glove Corporation, 279 Fed. 372, 374, that these two remedies are mutually exclusive, and are not cumulative; and where both are taken, as here, we will dismiss the remedy improperly taken, and decide the case upon the other. Inasmuch as this is a proceeding by creditors of the bankrupt to obtain payment of their coupons out of funds deposited by the bankrupt in the Empire Trust Company, we think this is a controversy arising in bankruptcy proceedings, and that the proper remedy is by appeal, under section 24a (Comp. St. § 9608), and not by petition to revise, under section 24b, of the Bankruptcy Act. See In re Toole (C. C. A.) 270 Fed. 195. The petition to revise is dismissed and the matter will be heard and determined upon the appeal, which entitles this court to review both questions of law and of fact.

The order from which this appeal is taken denies an application by the holders of certain bonds issued by the Metropolitan to the payment of the interest coupons, past due, out of a fund now on deposit in the Empire Trust. The fund in question, as appears from the statement of facts which precedes this opinion, was deposited from time to time to meet the interest on the bonds as it became due. This fund, at the date of the appointment of the trustee, amounted to $431,910. The bankrupt is the successor of the Metropolitan, which issued the bonds, and it became charged with the obligation of payment by virtue of the consolidation, which we have seen took place between the two companies. The question presented is whether the right which the coupon holders assert is superior to the right of the trustee of the bankrupt to have the fund turned over to him. The opinion in the court below, which sustains the right of the trustee to have the fund, and denying the right of the coupon holders to be first paid therefrom, is found in 277 Fed. 249.

The able counsel who argued this appeal insisted that the principle involved herein is governed by the principle laid down in Re Interborough Consolidated Corporation (D. C.) 267 Fed. 914. That case, however, involved the right of the holders of preferred stock, who had not collected dividends which they might have collected, had they applied for them before the bankruptcy occurred, to be paid after the bankruptcy out of the fund which the company had appropriated to pay the dividends, and the court held that such stockholders were entitled to be first paid out of the fund in preference to the trustee. The court, relying upon what this court had said in Staats v. Biograph Co., 236 Fed. 454, 458, 149 C. C. A. 506, L. R. A. 1917B, 728, stated his conclusion as follows:

"It follows in the case at bar that, the dividend having been declared and a fund having been set aside for the payment of dividends, the trustee has no right to so much of the fund as is necessary to pay dividends to those who by exchange of stock become shareholders."

A difference, however, exists between that case and the case now before the court. In that case the court was dealing with dividends which had been declared, and of which a fund had been set aside for

the payment, while in this case we are not dealing with dividends upon stock, but with the payment of interest upon bonds; and we do not find ourselves in accord with the learned counsel for the appellants in his proposition that the same principle is applicable to the two cases, and we do not think the authorities sustain him in his position.

[3] The law is established that where a corporation has not only declared a dividend, but has specifically appropriated and set apart from its other assets a fund out of which the dividend is to be paid, such action constitutes the assets so set apart a trust fund in the hands of the corporation for payment of the stockholders, to the exclusion of other creditors. Such is correctly stated to be the law in 14 Corpus Juris, 816; Cook on Corporations (7th Ed.) vol. 2, p. 1580. The latter writer states that, if funds to pay a dividend are placed on deposit at a bank, the deposit cannot thereafter be withdrawn or reclaimed, either by the corporation or by its receiver, since the stockholders have acquired a lien in equity upon the deposit.

The doctrine that when a dividend has been declared, and a fund for its payment has been set aside, the fund is held in trust for the stockholders, which cannot be reached by the general creditors or revoked by the corporation, was established by the courts in New York in 1836 in LeRoy v. Globe Insurance Co., 2 Edw. Ch. 657. The courts in that state have ever since consistently adhered to the principle then enunciated. Jermain v. Lake Shore & Michigan Southern Ry. Co., 91 N. Y. 483; Searles v. Gebbie, 115 App. Div. 778, 101 N. Y. Supp. 199; Id., 190 N. Y. 533, 83 N. E. 1131; Matter of LeBlanc, 14 Hun, 8, affirmed 75 N. Y. 598; People v. Bank, 39 Hun, 187; Hill v. Newichawanick Co., 8 Hun, 459; Lowne v. American Fire Insurance Co., 6 Paige, 482. This brings us to inquire whether the courts of New York sustain the proposition of counsel, to which we have above referred, that in principle no distinction exists between dividend moneys and interest moneys. We think the cases clearly show that a distinction does exist.

In 1899 the Appellate Division of the Supreme Court of New York, Second Department, decided the case of Staten Island Cricket & Baseball Club v. Farmers' Loan & Trust Co., 41 App. Div. 321, 58 N. Y. Supp. 460, which involved the following facts: The plaintiff executed to the defendant two mortgages, with the purpose of securing the payment of certain bonds which the plaintiff had issued. The bonds by their terms were payable at the plaintiff's office. The defendant simply could enforce the mortgages upon certain contingencies for the benefit of the bondholders. The plaintiff remitted annually to the defendant the amount of the interest due upon the bonds, and requested it to make payment of interest to the coupon holders, for which the plaintiff paid a small commission. The defendant opened a special account with the plaintiff in respect of these interest moneys, crediting the plaintiff with the amount received, and debiting it with the amount paid out. It came about that the defendant had $498.-50 over and above the amount paid upon the due coupons. The plaintiff demanded this sum from the defendant, and, payment being refused, brought suit to recover the same. It claimed that the defendant was simply its fiscal agent, and that the deposit of the moneys with it for

the payment of the interest due upon the coupons constituted it a mere depository for that purpose, and that it had the right, at any time before the actual disbursement of the moneys, to withdraw the same. The defendant claimed that the annual remittance of this money to it created irrevocable trusts in the same for the benefit of the coupon holders, and that, as the coupons had not yet been presented for the whole sum, it was required to hold the same to meet such demand. The defendant claimed, also, that it became a trustee by virtue of the remittance of the money to it for the particular purpose of paying the interest on the coupons. The claim of the defendant was not sustained by the court, which unanimously held that the relation created was that of debtor and creditor. "We are of opinion," said the court, "that by the act of deposit the plaintiff did not constitute the defendant a trustee, or impress the money with a trust inuring to the benefit of the bondholders; that its only effect was to constitute the defendant the agent of the plaintiff to distribute its moneys as it directed, and by virtue of the authority which it had to give the direction it had authority to revoke it and demand a return of its moneys." The fact was pointed out that the defendant had entered into no agreement to pay the bondholders, nor had it made any promise that it would pay them, and in the letter acknowledging the receipt of the money the defendant's statement was that the money had been passed to the credit of the plaintiff's account.

In 1917 the Appellate Division of the Supreme Court of New York, First Department, unanimously decided the similar case of Noyes v. First National Bank of New York, 180 App. Div. 163, 167 N. Y. Supp. 288. The facts in that case were that, prior to the appointment of its receiver, the Chicago, Rock Island & Pacific Railroad Company deposited in the defendant bank certain moneys to pay the interest, from time to time as it accrued, on certain coupon bonds which the railroad company had issued. The railroad company had an account in the bank, which was designated on the books of the bank by the title "Chicago, Rock Island & Pacific Railroad Company, Coupon Account." To this account was transferred $433,275 from the general account, and from time to time thereafter deposits continued to be made therein by the railroad company to meet the interest upon the bonds, which accrued semiannually, upon the presentation of the coupons. This practice had continued since 1905, and was in force in January, 1915, when a receiver was appointed for the railroad. The practice described continued after the appointment of the receiver, and without objection until December 9, 1905, when the receiver demanded that the bank turn over to him the amount standing in the account. This demand was predicated upon the assumption that the deposits, although made for a particular purpose, were none the less general deposits, and that they established, as between the bank and the railroad company, the conventional relation of debtor and creditor. The receiver further contended that, even if the deposits were to be considered special accounts, made with the bank for a special purpose, to which the bank was authorized to apply them, still the transaction, at most, only created a revocable agency, which the railroad might revoke

·at any time, and which was revoked in fact when the receiver demanded payment to himself. The bank, on the other hand, insisted that by opening the special account, and depositing therein only moneys intended to be used for the payment of interest on the coupons as presented, a trust resulted in favor of the holders of the outstanding coupons, and that the moneys thus deposited became so impressed with a trust that the bank, as trustee, was entitled to retain them and apply them to the purpose for which they were deposited. The court, however, held that the deposit created merely the relation of debtor and creditor, and that the transaction did not constitute the depository a trustee, or impress upon the money in its hands a trust in favor of the coupon holders. The court thought the material facts were not to be distinguished from those in Staten Island Cricket & B. B. Club v. Farmers' Loan & Trust Co. which it followed.

In the Noyes Case the railroad company had opened the account in question with a voucher reading as follows:

"Chicago, Rock Island & Pacific Railroad Company. Warrant in Favor of First National Bank. Address: 2 Wall Street, New York City. August 29, 1905. For deposit in Coupon Account of C., R. I. & P. R. R. Company to meet 6 mos. interest due Sept. 1, 1905, on $17,331,000 of its 5% bonds of 1913, $433,275.00."

The subsequent warrants in favor of the First National Bank were practically of the same character. The coupons were presented to the bank, which paid them directly by means of cashier's checks drawn on the deposited fund, and this the bank had continued to do for nearly 11 months after the appointment of a receiver without any objection on his part. The Noyes Case was affirmed unanimously without opinion by the New York Court of Appeals. 224 N. Y. 542, 120 N. E. 870.

[4] In the essential facts the Noyes Case and Staten Island Cricket & B. B. Club v. Farmers' Loan & Trust Co. cannot be distinguished from the instant case. It is to be observed that in the instant case the bonds and the coupons contained nothing more than a promise to pay at the office or agency of the company which issued them the amount due thereon. The form of the interest coupon involved is found in the margin,[1] and during the whole time under consideration herein the company paid all coupons presented by its own check, having previously deposited with the Empire Trust, as heretofore pointed out, a sum of money to pay all coupons before each coupon day—the Empire Trust doing no more, and never having agreed to do more, than to pay out of the moneys deposited such checks as the borrowing company chose to draw. Nothing that was said or done amounted to a declaration of trust, and the relation between the company which made the deposit and the Empire Trust, in which the deposit was made,

---

[1] "No.————.         $22.50
"On the first day of ————, 19—, Interborough Metropolitan Company will pay to bearer at its office' or agency in the city of New York, N. Y., twenty-two dollars and fifty cents, United States gold coin, being six months interest then due on its collateral trust four and a half per cent. gold bond No. ————.

————, Treasurer."

continued throughout, as between themselves, to be that of debtor and creditor; and such was also the relation between the company which issued the bonds, and of the company which succeeded to its obligations, on the one hand, and the bondholders and coupon holders, on the other. We find it impossible to spell out a trust in favor of the coupon holders, although we admit that we entered upon the consideration of this case inclined to think a trust relationship existed. We have been led by a careful scrutiny of the facts to a contrary conclusion.

The appellant, however, relies upon Rogers Locomotive & Machine Works v. Kelly, 88 N. Y. 235. The plaintiff in that case sought to compel the defendants to pay it the amount of certain coupons held by it out of moneys deposited with them for that special purpose. The Court of Appeals affirming the court below held that a trust had been created, and that the brokers with whom the funds were deposited were bound to pay the holders of the coupons. It appeared that the corporation deposited with the defendant brokers a fund to meet the payment of certain coupon bonds as they became due. The defendants receipted for the deposit as in trust to apply the same to an equal amount of coupons in the order in which they should be presented for payment, the said money not to be subject to the control of the depositor corporation, otherwise than for the payment of the coupons. The sheriff levied on the fund by virtue of an attachment against the company. The court held that the deposit was an absolute and irrevocable appropriation of the fund to the payment of the coupons, and the brokers became vested with the title for the purpose of the trust, and that the attachment was ineffective. The brokers in their receipt of the deposit stated that the money was received "in trust" to apply the same to the coupons, and that "the said money was not to be subject to the control of the said company, otherwise than for the payment of said coupons as above described." It is clear that in that case the transaction was a trust, that the brokers held the fund as trustees, and that the company making the deposit had parted with the title, and with all control of the fund inconsistent with the trust declared in the receipt. The facts in that case were so different from the facts in this that it is clearly distinguishable. The brokers were not agents, but trustees, and the corporation parted with its control over the fund. In the instant case the Empire Trust was a mere agent, and the bankrupt, in making the deposit, never parted with its control of the fund.

The declaration of a dividend by a corporation creates a debt as against it and in favor of the stockholders—a debtor and creditor relationship being established between the corporation and each of its stockholders. Staats v. Biograph Co., 236 Fed. 454, 458, 149 C. C. A. 506, L. R. A. 1917B, 728. But we have seen that, if the dividend has been not merely declared, but the fund for its payment has been actually set apart and distinguished from the general mass of the company's funds, the fund so set apart becomes a trust fund for the payment of the dividend, which cannot be reached by the general creditors of the corporation, and when it becomes a trust fund for the

payment of dividends it cannot be diverted and used for any other purpose. Staats v. Biograph Co., supra; In re Interborough Consol. Corporation (D. C.) 267 Fed. 914; LeRoy v. Globe Ins. Co., 2 Edw. Ch. (N. Y.) 657; In re LeBlanc, 14 Hun (N. Y.), 8, affirmed 75 N. Y. 599; Van Dyck v. McQuade, 86 N. Y. 38; Ford v. Easthampton Rubber Thread Co., 158 Mass. 84, 32 N. E. 1036, 20 L. R. A. 65, 35 Am. St. Rep. 462.

There seems to be a fundamental distinction between a fund set apart for the payment of a dividend and a fund set apart for the payment of an ordinary indebtedness. The general rule seems to be well established that, where a fund is placed by a debtor in the hands of a third party with instructions to pay it out on the future orders of the debtor, the fund continues to be the property of the debtor, and the fact that it was set aside for the purpose of paying a specified debt does not constitute it a trust fund. In 3 Pomeroy's Eq. Jur. § 1282, the law is stated as follows:

"In all cases, even when the assignee was not a creditor of the assignor, the order must be delivered to the intended payee, or he must be notified of it by the drawer's procurement, in order that it may operate as an equitable assignment. *A mere letter, communication, or other mandate to the agent, depositary, or debtor directing him to pay the fund to a designated person, will not of itself operate as an assignment; but it may be withdrawn or revoked at any time* before the arrangement is completed, by information given to the intended payee by or on behalf of the drawer."

And Mr. Justice Story, in his Commentaries on Equity Jurisprudence, sections 1045 and 1046, lays down the rule as follows:

"1045. In regard to the other class of cases above suggested, namely, those where the question may arise of an absolute appropriation of the proceeds of an assignment or remittance directed to be paid to particular creditors, courts of equity, like courts of law, will not deem the appropriation to the creditors absolute until the creditors have notice thereof and have assented thereto; for until that time the mandate or direction may be revoked or withdrawn, and any other appropriation made by the consignor or remitter of the proceeds. The true test whether an absolute appropriation is made out or not depends upon the point at whose risk the property is; and until the creditor has consented, the property will clearly be at the risk of the assignor or remitter. But if upon notice the creditors should assent thereto and no intermediate revocation should have been made by the assignor or remitter, there in equity the assignee or mandatary will be held a trustee for the creditors. * * *

"1046. It is true that in every case where a consignment or remittance is made with orders to pay over the proceeds to a third person the appropriation is not absolute; for it amounts to no more than a mandate from a principal to his agent, which can give no right or interest to a third person in the subject of the mandate. It may be revoked at any time before it is executed, or at least before any engagement is entered into by the mandatary with the third person to execute it for his benefit; and it will be revoked by any prior disposition of the property inconsistent with such execution. But if no revocation is made and the mandate continues in full force, the trust as such continues for the benefit of such third person who after his assent thereto notified to the mandatary, may avail himself of it in equity without any reference to the assent or dissent of the mandatary upon such notice; for his receipt of the property binds him to follow the orders of his principal."

And in 5 Corpus Juris, 913, it is stated that:

"A mere direction by a party to his agent to apply certain funds to the payment of a debt does not operate as an equitable assignment of such fund, because such direction, until acted upon, may be revoked."

The fund here in controversy and deposited in the Empire Trust was not received by the latter under instructions to distribute it among specified creditors, or to the coupon holders. It was received by the Empire Trust to be paid out on account checks to be drawn by the Interborough and directed to be charged against the separate account which had been created.

In Adams v. Hackensack Improvement Commission, 44 N. J. Law, 638, 43 Am. Rep. 406, the Hackensack Improvement Commission, having been duly authorized to construct sewers and to provide for the expense thereof by the issuance of bonds, issued its bonds and made them payable at the Bank of Bergen County. The plaintiff had three of these bonds. The commission, prior to the maturity of the bonds, deposited with the said bank a sum of money sufficient to pay the plaintiff's bonds, as well as all the bonds maturing at the same time. The money was deposited to the credit of the Hackensack Improvement Commission on "Sewer Bond Account," and the officers of the bank were authorized to pay the bonds on presentation. The plaintiff had no knowledge of this arrangement, or other information as to the method of payment, except that the place of payment was mentioned in the bonds. After this deposit to pay the bonds was made the bank failed. The plaintiff's bonds had not been left with the bank for collection, nor were they presented for payment until after the failure of the bank. In an action brought by the plaintiff against the commission to recover on the bonds, the New Jersey Court of Errors and Appeals in an opinion, concurred in by all 15 of the Justices, held that the action could be maintained against the commission, and that the bank was not the agent of the plaintiff for the purpose of receiving payment of the money due to her upon her bonds, and that the loss arising from the failure of the bank was the loss of the commission. The court treated the question involved as simply one of agency and said:

"Making a bill or note payable at a banker's is authority to the banker to apply the funds of the acceptor or maker on deposit to the payment of the paper. 1 Daniel's Neg. Inst. 326a. If maturing paper be left with the banker for collection, he becomes the agent of the holder to receive payment; but, unless the banker is made the holder's agent by a deposit of the paper with him for collection, he has no authority to act for the holder. The naming of a bank in a promissory note as the place of payment does not make the banking association an agent for the collection of the note, or the receipt of the money. No power, authority, or duty is thereby conferred upon the banker in reference to the note; and the debtor cannot make the banker the agent of the holder by simply depositing with him the funds to pay it with. Unless the banker has been made the agent of the holder by the indorsement of the paper or the deposit of it for collection any money which the banker receives to apply in payment of it will be deemed to have been taken by him as the agent of the payer. 1 Daniel's Neg. Inst. 326; Hills v. Place, 48 N. Y. 520. Such a deposit without some act of appropriation by the banker, does not create any privity of contract as between the banker and the holder of the paper. Hill v. Boyds, L. R. 8 Eq. 290; Johnson v. Roberts, L. R. 10 Ch. App. 505; Barned's

Banking Co., In re Massey, 22 L. T. (N. S.) 853; Bank of Republic v. Millard, 10 Wall. 152."

There are certain principles we regard as established:

[5] 1. On a general deposit of money in a bank to the credit of the depositor, to be repaid on demand, the title to the money so deposited passes from the depositor to the bank, and the relation of debtor and creditor is created—the bank becoming the debtor to the depositor. National Bank of Republic v. Millard, 10 Wall. 152, 19 L. Ed. 897; Kentucky Bank v. Wister, 2 Pet. 318, 7 L. Ed. 437. Such deposits create no trust relationship.

[6] 2. If a fund is deposited in a bank for a specific purpose, but subject to the depositor's check, it remains the property of the depositor, and is subject to the right of set-off. Continental Trust Co. v. Chicago Title Co., 229 U. S. 435, 446, 33 Sup. Ct. 829, 57 L. Ed. 1268. Such a right is necessarily inconsistent with the existence of a trust. The right of set-off negatives the existence of a trust.

[7] 3. If bonds are made payable at a particular bank and at a particular time, and funds are left with the bank to be applied in payment of the bonds, such funds are held by the bank as the agent of the obligor, and not as the agent of the obligee. Cheney v. Libbey, 134 U. S. 68, 83, 10 Sup. Ct. 498, 33 L. Ed. 818.

[8] 4. If A. sends money to B., with directions to apply it to a debt due from him to B., the latter holds the money in trust to apply it as directed by A.; and if B. declines to make the application as A. directed then B. holds the money subject to A.'s order. Libby v. Hopkins, 104 U. S. 303, 309, 26 L. Ed. 769. A. parted with control over the fund when he placed it in B.'s possession.

[9] 5. If A. places money in the hands of B., to be delivered to C., a trust arises in favor of the latter. The acceptance of the money with notice of its ultimate destination creates a duty on the part of B. to devote it to the purpose intended, and a court of equity will enforce the trust. McKee v. Lamon, 159 U. S. 317, 322, 16 Sup. Ct. 11, 40 L. Ed. 165. In this instance also A. parted with control over the fund when he placed it in B.'s possession.

[10] Every person who receives money to be paid to another, or to be applied to a particular purpose, to which he does not apply it, is a trustee, and may be sued either at law for money had and received, or in equity as a trustee, for a breach of trust. Taylor v. Benham, 5 How. 233, 274, 12 L. Ed. 130; Kane v. Bloodgood, 7 Johns. Ch. (N. Y.) 110, 11 Am. Dec. 417. But in this class of cases the fund is in the possession and control of the trustee who is bound under his contract to apply it in accordance therewith and for no other purpose. And in the instant case the trust company assumed no obligation to the petitioner as respects the debt herein involved—its only obligation, under its contract with the bankrupt, being to pay such checks as the bankrupt might draw against the fund and the petitioner had no such checks.

In National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693, the court held in a learned opinion written by Mr. Justice Matthews that a bank could not assert its lien, for an obligation which it knew

was incurred for the private benefit of the depositor, when the bank account was opened in the name of a depositor as general agent of an insurance company, and the bank knew that the account was opened to facilitate his insurance business and was used as a means of accumulating premiums on policies collected by him for the company. The court held the bank was chargeable with notice of the equitable rights of the insurance company in the moneys so deposited. It was held that the insurance company could enforce by bill in equity its beneficial ownership in the funds so deposited against the bank claiming a lien thereon for a debt due to it, which the depositor had contracted for his individual use. The court said:

"A bank account, it is true, even when it is a trust fund, and designated as such by being kept in the name of the depositor as trustee, differs from other trust funds which are permanently invested in the name of trustees for the sake of being held as such; for a bank account is made to be checked against, and represents a series of current transactions. The contract between the bank and the depositor is that the former will pay according to the checks of the latter, and when drawn in proper form the bank is bound to presume that the trustee is in the course of lawfully performing his duty, and to honor them accordingly. But when against a bank account, designated as one kept by the depositor in a fiduciary character, the bank seeks to assert its lien as a banker for a personal obligation of the depositor, known to have been contracted for his private benefit, it must be held as having notice that the fund represented by the account is not the individual property of the depositor, if it is shown to consist, in whole or in part, of funds held by him in a trust relation."

In that case the fund deposited was not the individual property of the depositor, but consisted of funds the beneficial ownership of which was in the insurance company, for which it was collected by the depositor, who was merely the company's agent. In the instant case the fund deposited was the individual property of the bankrupt, and the petitioner's rights therein were not different from those of any other creditor.

We have thus far considered this case upon the theory, advanced by the original petitioner, that the fund involved was held in trust for the coupon holders. The interveners, however, base their claim upon a different theory. They do not assert the existence of any trust, but they claim that an equitable lien exists in their favor. In the brief presented by them they say:

"As against the Empire Trust Company, the depository of the fund, no liability is here asserted except in its capacity as custodian of the fund. It is not sought here to charge the trust company as trustee of that fund."

While their counsel in the court below argued that a trust was created for the benefit of the holders of coupons, including the interveners, in this court their entire argument was rested upon the contention that the coupon holders are entitled to an equitable lien upon the fund deposited with the Empire Trust, with the additional suggestion that a court of equity should grant relief upon the ground of hardship. But the argument by which it is sought to establish an equitable lien seems to us as untenable as that by which it was sought to show, on behalf of the original petitioner, the existence of a trust. An equitable lien is neither a jus in re nor a jus ad rem. It is not a property in the

thing itself, nor does it constitute a right of action for the thing, but is simply a charge upon it, and, as was remarked by Erle, J., in Brunsdon v. Allard, 2 El. & El. 19 "the words equitable lien are intensely undefined."

[11, 12] The doctrine of equitable liens has been liberally extended in modern times to facilitate mercantile transactions. But it has been done to give effect to the intention of the parties to create specific charges and that that intention might be justly and effectually carried out. But the courts are not authorized to find the intention when none existed. In Hopkinson v. Forster, L. R. 19 Eq., 74, at page 75, the Master of the Rolls observed: "You can have no charge in equity without an intent to charge." The intent to *charge* is not made out in this case. It is not established simply by showing that the fund in controversy was originally deposited with the intention that it would be checked out to pay interest on the coupons but without any agreement with the coupon holders that it would be so used. A particular fund is not "charged," unless it is bound for the performance of an obligation imposed. A charge is defined in Bouvier's Law Dictionary as "a lien, incumbrance, or claim which is to be satisfied out of the specific thing or proceeds thereof to which it applies." And see Abramson v. Horner, 115 Md. 232, 80 Atl. 907. It seems to us perfectly plain that if A. deposits a sum of money in a bank, intending to use it to pay B. what he owes him, but without agreement with B. that he is to be paid out of the money so deposited, it cannot be maintained that the fund has been "charged" with the payment of B.'s debt, or that any lien or incumbrance has been created in favor of B. which prevents A. from appropriating the fund to some other use, if he decides to do so.

It has been held that even an agreement to pay a debt out of a designated fund does not in itself create a lien upon the fund. Thus it is laid down in 19 Am. & Eng. Encyc. of Law (2d Ed.) p. 16, as follows:

"But a mere agreement to pay a debt out of a designated fund does not give an equitable lien upon the fund, or operate as an equitable assignment thereof. There must be an appropriation of the fund pro tanto, either by giving an order, or by transferring it otherwise in such a manner that the holder is authorized to pay the amount directly to the creditor without the further intervention of the debtor."

[13] Cases are cited in its support. And in Bispham's Equity (8th Ed.) it is said that the better opinion would seem to be that a mere *promise* to pay out of a fund does not operate as an assignment of the fund. But it is now definitely settled in the federal courts that a promise based on a consideration to pay out of a particular fund creates a lien on the fund, which attaches to the fund when it comes into existence and which equity will enforce, holding the promisor to be a trustee as soon as he gets title. Barnes v. Alexander, 232 U. S. 117, 120, 121, 34 Sup. Ct. 276, 58 L. Ed. 530.

[14, 15] A contract whereby a contracting party sufficiently indicates an intention to make some particular property or fund which it describes a security for a debt or other obligations creates an equitable lien on the property so indicated. Ingersoll v. Coram, 211 U. S. 335, 368, 29 Sup. Ct. 92, 53 L. Ed. 208. A contract which shows an inten-

tion to charge a particular property therein identified with an obligation creates an equitable lien thereon. Hauselt v. Harrison, 105 U. S. 401, 26 L. Ed. 1075; Gregory v. Morris, 96 U. S. 619, 24 L. Ed. 740. And if a party by agreement creates a charge or claim in the nature of a lien on property of which he is the owner or in possession, a court of equity will establish and enforce it, not only against the party who stipulated to give it, but also against third persons who are either volunteers, or take with notice. Walker v. Brown, 165 U. S. 654, 664, 17 Sup. Ct. 453, 41 L. Ed. 865.

No contract of any character was entered into between the Empire Trust and the holders of the bonds with respect to the interest on the bonds. The only contract which that company made was with the bankrupt, and it was that it would pay the checks drawn by the bankrupt when properly presented to it. No agreement was ever made by the bankrupt with the interveners that their interest coupons should be paid out of any particular fund, either that deposited with the Empire Trust or any other. And the interveners hold no check drawn against any fund. The interveners clearly did not contract with the bankrupt upon the credit of the particular fund in controversy, there being no agreement either with the bondholders or with the trustee of the mortgage that this or any other special fund should be set apart from the general assets to pay interest as it matured. After the fund was deposited with the Empire Trust, the control over it always remained in the bankrupt, and it was at the risk of the bankrupt, and might have been taken by attaching creditors.

The case of Sexton v. Kessler, 225 U. S. 90, 32 Sup. Ct. 657, 56 L. Ed. 995, is an illuminating one upon the subject of equitable liens, and goes far in support of such a lien in controversies between a trustee in bankruptcy and a creditor asserting a lien. In that case a banking firm in New York placed in a separate package in its safe deposit vaults certain of its securities, and marked the package "Escrow for Account of Kessler & Co., Limited, Manchester." Kessler & Co. was an English banking house, upon which the New York firm was in the habit of drawing drafts. The English house had requested the New York firm to set aside securities for their drawing credit. The New York firm wrote the English house that it had placed in its vaults certain securities in a package marked as above stated, and it added:

"This escrow is intended as a protection against our long drawings against your good selves."

This letter was acknowledged and the English house wrote that:

"If at any time you have the opportunity of realizing these securities, or any part of them, you are at liberty to take them and to replace them by others of equal value, though in that case we should, of course like to see rather better quality."

Substitutions of other securities were made from time to time; the English house always being notified thereof. This situation continued for several years, and less than a month before the New York firm was adjudicated a bankrupt, and when it was insolvent, it delivered the package of securities to the agent of the English house. The continued physical power of the New York firm over the securities, and

the right which it reserved to withdraw any of the securities and substitute others, while seemingly inconsistent with title or a lien in the English house, was not regarded as sufficient to defeat the right to an equitable lien. The court sustained the right upon the ground that before the bankruptcy occurred the English house had an equitable right, at least, to possession of the securities if it wanted it. The court declared that:

"When the English firm took the securities, it only exercised a right that had been created long before the bankruptcy and in good faith. Such we understand to be the law of New York, and in the absence of any controlling statute to the contrary, such we understand to be what the law should be."

But Sexton v. Kessler is plainly distinguishable from the case now before us. In the instant case, as before pointed out, there was at no time any agreement with the interveners that any specific property should be segregated and held to secure the debt due to the interveners and which they could have taken possession of to secure their claim. The fund in the Empire Trust, as we have seen, was at all times within the control of the bankrupt, and the interveners had no greater right therein or to possession thereof than they had to any of the other assets of the bankrupt.

[16] The Empire Trust, in which the fund in question was deposited, was simply the agent of the bankrupt, which deposited it, and which agreed with it that it would pay it out upon the bankrupt's checks when they were presented. As this agreement created a mere agency to transfer the fund on behalf of the principal, the agency, like every other agency not coupled with an interest, was revocable at pleasure, and conferred no title or equitable lien upon any third party or coupon holder.

[17] A distinction exists between an equitable lien and an equitable assignment. An equitable lien, while not a title, is available by way of charge. An equitable assignment gives the assignee a title which, although not cognizable at law, equity will recognize. Nothing that was done between the interveners and the bankrupt, or between the interveners and the Empire Trust, which held the fund, operated as an equitable assignment of any part of it. See Bispham's Equity (8th Ed.) § 167.

[18] No particular form of words seems to be necessary to make a valid equitable assignment of a chose in action. A written or verbal declaration disclosing an intention to part with the ownership of the chose is all that is required. Yeates v. Groves, 1 Vesey, Jr. 281; Taft v. Bowker, 132 Mass. 277. And while an equitable assignment or lien does not arise against a deposit account solely by reason of a check drawn against the same, yet if in the transaction connected with the check's delivery the understanding and agreement of the parties was that the advance about to be made should be a charge on a specified fund, a court of equity will carry the agreement into effect as against the drawer of the check, mere volunteers, and parties charged with notice. Fourth Street Bank v. Yardley, 165 U. S. 634, 644, 17 Sup. Ct. 439, 41 L. Ed. 855. But the mere giving of a check on an ordinary deposit account in a bank in the usual course of business in payment of a past indebtedness does not amount to an equitable assignment,

even though the drawer makes a deposit expressly to cover the check. In such a case it has been held that a garnishment of the bank after other deposits have been made and checks given, but before such check has been presented, creates a lien on the deposit superior to the rights of the payee. Poland v. Love, 164 Fed. 186, 91 C. C. A. 466. In the instant case, however, no check was ever given to the interveners to pay the interest on the coupons for the payment of which the suit is brought.

[19] But, granting that no trust was created and that no equitable lien was established, it is said that a court of equity should grant relief on the ground of hardship. It is argued that, where a party may be deprived of property or money by his failure to do an act which he is prevented from doing by some unforeseen accident or emergency, a court of equity will consider that as done which could have been done, had it not been for the accident, and grant to the party the right of which he otherwise, by strict rules of law, would have been deprived. It is quite true that in certain classes of cases relief has been granted in equity upon the ground of accident. Without enlarging upon the subject at this time, we content ourselves with saying that the principle which counsel seeks to invoke to support the contentions of these appellants does not seem to us applicable to the facts of this case. Conceding, as we do, that courts of equity from their earliest existence have granted relief on the ground of accident in certain cases, it is equally true that it is not every case of accident or hardship which justifies the interposition of the court. And it is also true, as stated in Mr. Justice Story's Commentaries on Equity Jurisprudence, § 101, that in matters of positive contract and obligation accident affords no ground for the interference of equity.

Order affirmed.